## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| GFSI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 05-2302-KHV |
| | ) | |
| J-LOONG TRADING, LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GFSI, Inc. ("GFSI") brings suit against J-Loong Trading, Ltd. ("J-Loong"), alleging that it supplied defective and non-conforming goods, and seeks money damages under Section 2-711 of the Kansas Uniform Commercial Code, K.S.A. § 84-2-711.  The Court granted J-Loong summary judgment on its counterclaim for the price of other goods delivered to GFSI.  See Memorandum And Order (Doc. #61) filed December 6, 2006.  This matter is before the Court on a bench trial of the GFSI claims, which the Court conducted on January 10 and 11, 2007.  The Court finds that GFSI is entitled to judgment and makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.[1]

This case involves four categories of purchase orders for garments: (1) purchase orders for which J-Loong delivered conforming garments after the contract delivery date and for which it received payment from GFSI; (2) purchase orders for which J-Loong delivered non-conforming garments or garment packaging and

---

[1]     Because of the nature of the claims, which involve multiple purchase orders for similar items, the Court has integrated its findings of fact and conclusions of law for each category of purchase orders and debit memos.

for which it received payment from GFSI; (3) purchase orders for which J-Loong timely delivered conforming garments, but did not receive payment because GFSI attempted to take credits for garments delivered after the contract delivery date and defective garments subject to other paid purchase orders, i.e. the first and second categories of purchase orders; and (4) purchase orders for which J-Loong did not deliver goods because GFSI had not paid prior purchase orders for which J-Loong delivered conforming garments, i.e. the third category of purchase orders.  As to the third category of purchase orders, the Court has granted summary judgment in favor of J-Loong.  As to the remaining categories of purchase orders, the Court finds that GFSI is entitled to judgment.

GFSI is a Delaware corporation with principal offices in Lenexa, Kansas.  J-Loong is a limited company under the law of Hong Kong, a Special Administrative Region of the People's Republic of China (PRC), and has its principal place of business in Kowloon, Hong Kong, PRC.

GFSI imports and sells branded active sports and leisure wear.  Its brands include the federally registered "Gear for Sports" trademark.  J-Loong sells garments for resale in retail markets around the world. During 2004 and early 2005, GFSI gave J-Loong a number of purchase orders for garments to be manufactured in various factories in Asia.  Before it placed any orders, GFSI provided J-Loong a Requirements Manual which set forth GFSI quality control standards and other requirements.  Before GFSI ordered any garments, J-Loong gave samples of polo shirts and fleece jackets in various sizes and colors.  These samples met the specifications set forth in the Requirements Manual.  By providing garment samples which complied with the Requirements Manual, J-Loong warranted to provide goods to GFSI in compliance with the Requirements Manual.  See K.S.A. § 84-2-313(1)(c); K.S.A. § 84-2-313, official UCC cmt. 6 to (presumption that sample or model becomes basis of bargain).  GFSI issued a number of purchase orders to

-2-

J-Loong and a series of letters of credit to effectuate payment for these orders.  After GFSI issued a purchase order for specified garments, J-Loong manufactured the garments in Asia and delivered them to GFSI's shipper in the country where the garments were made.

GFSI paid J-Loong the free on board ("F.O.B.") price for garments.  The F.O.B. price was $3.60 per polo shirt and $7.70 per fleece jacket.  After GFSI received the garments from J-Loong at various ports in Asia, GFSI paid import duties on the garments ($.709 per polo shirt; $1.224 per fleece jacket), a Shaw tax ($.07 per garment), commissions to agents of five per cent of the F.O.B. price ($.18 per polo shirt; $.385 per fleece jacket) and costs to ship the garments to Kansas ($.22 per polo shirt; $.181 per fleece jacket).  J-Loong was required to pay shipping beyond the delivery point in Asia if it did not deliver the garments by the delivery date specified in the purchase order, but not otherwise.

As GFSI received garments, it discovered that some polo shirts (style G1225) and fleece jackets (style G5020) were defective.  GFSI notified J-Loong of the defects and its intent to deduct its damages from amounts which it owed J-Loong on other invoices.  Beginning in October of 2004, GFSI issued a series of debit memos to J-Loong to effectuate those set-offs.[2]

As noted above, J-Loong asserted a counterclaim for the price of non-defective goods which it had delivered to GFSI.  GFSI acknowledged receipt of those garments and had no quality issues with them.  On December 6, 2006, the Court sustained J-Loong's motion for summary judgment on its counterclaim.  As a

---

[2]     The debit memos involve set-off damages for orders other than those at issue in J-Loong's counterclaims.  J-Loong refused to recognize the validity of GFSI charge backs, and GFSI refused to pay J-Loong the invoices which were the subject of its counterclaim.

matter of law, GFSI owes J-Loong the principal amount of $426,777.30 on its counterclaim.[3]  Pre-judgment

interest on the past-due amounts in accordance with K.S.A. § 16-201 is calculated at the rate of 10 per cent

per annum.  Through February 3, 2005, interest due and owing J-Loong totaled $7,648.66.  Such interest

continues to accrue at the rate of $116.93 per day from February 4, 2005 until the date of final judgment.

K.S.A. § 16-201.  As explained in the Court's prior order (Doc. #61), set-off is not a proper defense to

payment for J-Loong's claims, but rather is a separate affirmative claim by GFSI on each purchase order and

associated invoice under Article 2 of the Kansas Uniform Commercial Code (UCC).

I.      **Remedies Under The Uniform Commercial Code**

GFSI and J-Loong entered into a series of contracts for the sale of goods pursuant to K.S.A. § 84-2-

101 *et seq.*  Each purchase order from GFSI to J-Loong constituted a separate contract.  GFSI has the burden

to establish any breach of contract and any damages with respect to the goods accepted.  See K.S.A.

§ 84-2-607(4).  Except for one debit memo for non-delivery of garments, GFSI has elected to pursue damages

for breach of warranty.[4]

The UCC provides generally that remedies "shall be liberally administered to the end that the aggrieved

party may be put in as good a position as if the other party had fully performed."  K.S.A. § 84-1-106; see

---

[3]      The following sums were due J-Loong under its counterclaim: $84,456.00 due September 23, 2004; $54,025.20 due November 6, 2004; $528.00 due November 15, 2004; $132,899.60 due November 20, 2004; $2,810.50 due November 25, 2004; $3,051.40 due December 3, 2004; $4,742.40 due December 5, 2004; $8,467.20 due December 12, 2004; $16,165.20 due December 15, 2004; $20,841.60 due December 19, 2004; $3,676.80 due January 5, 2005; $21,156.60 due January 8, 2005; $19,464.00 due February 1, 2005; and $54,492.80 due February 2, 2005.

[4]      As to Debit Memo ("DM") 870, GFSI elected cover damages under the UCC with regard to the underlying purchase order.  See K.S.A. § 84-2-712 (cover damages).

-4-

Farm Serv. Ctr., Inc. v. Panning, 147 P.3d 1095 (Table), 2006 WL 3773108, at *3 (Kan. Ct. App. Dec. 22, 2006).  Under the Kansas UCC, a buyer may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.  K.S.A. § 84-2-714(1).  Ordinarily, the measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."  K.S.A. § 84-2-714(2).  In addition, in a "proper case," incidental and consequential damages under K.S.A. § 84-2-715 may be recovered.  K.S.A. 84-2-714(3).

Incidental damages are expenses incurred after the breach to mitigate the resulting losses.  Incidental damages must be the reasonably-contemplated "probable result" of the breach, or arise from the breach itself. La Villa Fair v. Lewis Carpet Mills, Inc., 219 Kan. 395, 405, 548 P.2d 825, 834 (1976); Schatz Distrib. Co. v. Olivetti Corp. of Am., 7 Kan. App.2d 676, 681, 647 P.2d 820, 825 (1982).  Incidental damages include "commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."  K.S.A. § 84-2-715(1).  Consequential damages are distinguishable and result from investments made before breach to enable the buyer to use the seller's performance.  K.S.A. § 84-2-715, Kansas cmt. 1.  Consequential damages include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise," and "injury to person or property proximately resulting from any breach of warranty."  K.S.A. 84-2-715(2)(a) and (b).

To recover under Section 84-2-714, a buyer must give notification under subsection (3) of K.S.A. § 84-2-607.  Under Section 84-2-607, where a tender has been accepted, the buyer must within a reasonable

time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any

remedy.   K.S.A. § 84-2-607(3)(a).   Whether a buyer notifies a seller of a breach of warranty within a

reasonable time is a question of fact to be determined from all the facts and circumstances.  Brunner v. Jensen,

215 Kan. 416, 428-29, 524 P.2d 1175, 1185 (1974).

## II.   Untimely Deliveries

As explained above, under the parties' agreement, J-Loong was required to pay for shipping beyond

the delivery point in Asia if it did not deliver the garments by the delivery date specified in the purchase order.

On four purchase orders in late 2004, J-Loong did not deliver fleece jackets until after the specified delivery

date.   In December of 2004 and January of 2005, GFSI issued DM 847 (for $38,836.14), DM 863 (for

$2,270.70), DM 864 (for $375.84) and DM 865 (for $8,226.06), which are charge backs for air freight

expenses which it incurred for certain fleece jackets.   GFSI's expenses were commercially reasonable and

necessary under the circumstances.   Under the parties' contracts, GFSI is entitled to recover $38,836.14 on

DM 847, $2,270.70 on DM 863, $375.84 on DM 864 and $8,226.06 on DM 865.[5]

## III.   Non-Conforming Garments And Packaging

### A.   Polo Shirts

The Requirements Manual provides that failure to fold a garment as specified is a major defect.  When

polo shirts arrived at the GFSI warehouse in Kansas, GFSI discovered that some collars had not been pressed

and were rolled up.  J-Loong did not offer to cure this defect so GFSI bought steam irons and hired temporary

---

[5]      J-Loong does not dispute the charge backs in these debit memos and has proposed a finding
which awards GFSI the full amount of these expenses.   See Defendant's Proposed Findings Of Fact And
Conclusions Of Law (Doc. #93) filed February 9, 2007 at 24.

labor to correct the problem.  J-Loong concedes that GFSI is entitled to recover these costs.

The Requirements Manual also provides dimensional stability (shrinkage) requirements which apply to polo shirts.  It specifies that unwashed garments should not shrink more than 7 per cent in length and 5 per cent in width and that failure to meet these requirements is a critical defect.[6]  GFSI received returns and customer complaints due to excessive shrinkage of polo shirts manufactured by J-Loong.  GFSI therefore performed internal tests which confirmed that the shirts did not meet the shrinkage parameters of the Requirements Manual. Its tests showed as much as 13.25 per cent shrinkage for length and 8.52 per cent shrinkage for width.

GFSI asked J-Loong to send polo samples to a certified testing laboratory, MTL-ACTS.  Those tests confirmed that the shirts did not meet the shrinkage standards in the Requirements Manual.[7]  Because the polo shirts shrank a full size when laundered, the shirts were essentially labeled one size too large.  GFSI used outside vendors to re-label the polo shirts and sold most of the re-labeled polo shirts as part of its regular inventory.  Because of the shrinkage issue, however, GFSI ended up with 13,692 extra small men's polo shirts.

---

[6]    GFSI incorporated into its Requirements Manual Technical Manual 150 (TM 150) of the American Association of Textile Chemists and Colorists (AATCC).  Dana Schlemmer, head of the GFSI quality control department, acknowledged the authoritative nature of TM 150 and that it applies to testing of the polo shirts which J-Loong manufactured.

[7]    J-Loong notes that in GFSI internal tests, GFSI did not "condition" the polos by hanging them on hangers for four hours under certain humidity and temperature conditions as required by TM 150.  Even so, Schlemmer testified that the lack of conditioning would not account for the significant variations between the test results and the standards in the Requirements Manual.

J-Loong also complains that GFSI's sampling method was insufficient under TM 150.  GFSI's internal tests did not satisfy the detailed requirements under TM 150.  When the internal tests are viewed in light of the returns, the customer complaints and the MTL-ACTS test results, however, they establish that the polo shirts did not comply with the shrinkage standards in the Requirements Manual.  Even though the MTL-ACTS test results do not show the magnitude of shrinkage found in the GFSI tests, MTL-ACTS found that the garments did not comply with the shrinkage standards in the Requirements Manual.

GFSI does not sell extra small men's polo shirts in the ordinary course of business and does not have a market for this size shirt.

GFSI timely notified J-Loong of the defects in the polo shirts under K.S.A. § 84-2-714(1). J-Loong also knew of GFSI complaints with regard to the shrinkage as early as July of 2004, when it submitted garment samples for testing. In August of 2004, in a meeting between GFSI and J-Loong officials in Hong Kong, GFSI notified J-Loong of the specific shrinkage defects in the garments and its efforts to remedy the defects. J-Loong did not deny that the polo shirts failed to meet shrinkage standards, but it did not offer to cure the defects in shirts which it had already delivered.

### 1.   **DM 769**

On October 4, 2004, GFSI issued DM 769, which is a charge back for expenses which GFSI incurred to repair the defects in the polo shirts. GFSI incurred the following expenses: $17,918.20 for collar pressing, $60,722.20 for re-labeling, $9,317.21 for freight and $22,759.56 for labels. J-Loong concedes that it must pay the expense for collar pressing. GFSI incurred the expenses under DM 769 as a direct result of J-Loong's non-conforming tender of goods. Except with respect to the re-labeling of small polos to extra small, GFSI's actions were commercially reasonable and necessary under the circumstances.[8] K.S.A. §§ 84-2-714(1), 84-2-715(2)(a); see K.S.A. § 84-2-714, Kansas cmt. 2 (when repair possible, best measure of damages for breach of warranty is cost of repair); Manouchehri v. Heim, 941 P.2d 978, 981 (N.M. Ct. App.

---

[8]     As to the re-labeling of polos from small to extra small, GFSI asserts that inventory monitoring and FCC labeling requirements required it to re-label the shirts. As explained above, GFSI had no market for extra small polos. Despite the lack of a market, GFSI spent $6,495.95 to re-label the small polos to extra small. For minimal expense, GFSI could have set aside the boxes and/or marked them so that its employees did not mistakenly sell them as size small polos.

1997) (cost of repair appropriate measure of direct damages; cost of repair approximates difference between value of goods as warranted and value of goods as accepted); see also Int'l Petroleum Serv., Inc. v. S&N Well Serv., Inc., 230 Kan. 452, 460, 639 P.2d 29, 36 (1982) (used goods); 1 James J. White & Robert S. Summers, Uniform Commercial Code § 10-2, at 705-06 (5th ed. 2002) (cost of repair commonly awarded as direct damages).  Because GFSI unnecessarily incurred expenses of $6,495.95 in re-labeling small polos to extra small, the Court disallows that amount from DM 769.  The Court awards GFSI a total of $104,221.22 for DM 769.[9]

2.     **DM 869**

On January 28, 2005, GFSI issued DM 869, a charge back for expenses which it incurred for the landed cost of the extra small polo shirts for which it had no market.  The charge back sought to recover the F.O.B. price plus transportation and related expenses, i.e. GFSI's cost of transporting the shirts to the United States.  GFSI calculated that amount by multiplying the number of extra small shirts in inventory at the time it issued the debit memo (14,396) by the landed cost of each shirt ($4.72 – F.O.B. price plus transportation and related costs).  GFSI's current inventory of extra small polo shirts is 13,692, and it has revised the charge back to $64,626.24.[10]

---

[9]     J-Loong suggests that GFSI could have sold the extra small polos at its annual warehouse sale. J-Loong notes that at the annual warehouse sale, GFSI sold polos of similar quality for $8.00 to $10.00 per shirt. J-Loong, however, has not shown that GFSI could sell extra small polos at its annual warehouse sale. In addition, evidence of the quality of polos sold at GFSI's warehouse sale is irrelevant to whether the goods provided by J-Loong were defective.

[10]    GFSI explained that it hand counted its inventory to arrive at the current total of 13,692. Previously it had used its computer system to estimate the number of extra small polos at 14,396. In light of the fact that GFSI had no market for extra small shirts, the Court concludes that it did not sell 704 shirts, but simply miscounted them the first time.

J-Loong argues that GFSI cannot pass on its cost of duties, freight, commission to its agents, miscellaneous charges and taxes because these expenses were the ordinary and necessary expenses of its business dealings with J-Loong. GFSI could not sell the extra small polo shirts, however, so it is entitled to recover transportation and related costs for those shirts as "incidental damages resulting from the seller's breach." K.S.A. § 84-2-715(1). The award should be reduced, however, by $1.50 per polo – the average salvage value of the garments. See Lindsley v. Forum Rests., Inc., 3 Kan. App.2d 489, Syl. ¶ 4, 596 P.2d 1250, Syl. ¶ 4 (party injured by breach of contract has duty to exercise reasonable care to mitigate damages), rev. denied, 226 Kan. 792 (1979). Under DM 869, GFSI is awarded $44,088.24, i.e. $3.22 ($4.72 landed cost minus $1.50 salvage value) for each of 13,692 polos.

J-Loong's failure to comply with the polo shirt standards in the Requirements Manual constituted a breach of J-Loong's obligations and warranties under the purchase orders. As incidental damages, the Court awards GFSI $104,221.22 under DM 769 and $44,088.24 under DM 869. See K.S.A. §§ 84-2-714, 84-2-715(1).

B.      Fleece Jackets

The Requirements Manual provides that dye defects and zipper malfunctions are major defects. As GFSI received garments at its warehouse, it discovered that some fleece jackets had stains on the fabric. The stains occurred because zipper tape and black trim on the jackets "crocked" or transferred color, onto the contrasting material of jackets packed in the same carton. In other words, the zipper tape bled to the back of the garment packed in front of it. Upon discovery, GFSI timely notified J-Loong of the stains under K.S.A. § 84-2-714(1). J-Loong attempted to remedy the problem by reducing the buffer zone between the zipper teeth and the jacket fabric. After it did so, however, the zippers did not work properly because they caught

-10-

on the jacket material.  Through customer complaints, GFSI also discovered that the black trim bled on to the contrasting jacket material when laundered.

GFSI sent jacket samples to MTL-ACTS to test the color fastness of the trim.  The jackets failed the color fastness testing.  They were defective and did not meet the standards of the Requirements Manual. J-Loong did not cure or offer to cure the defects in the jackets which it had already delivered to GFSI.

GFSI sent the defective jackets to be laundered by an outside vendor in the Kansas City area.  When the vendor could not complete the job on time, GFSI located another vendor in Tennessee to assist.  GFSI later determined that jackets with black zippers could not be cleaned, so it proceeded to clean only those jackets with silver zippers.  As part of its regular inventory, GFSI sold the fleece jackets which could be repaired.

J-Loong argues that GFSI's color, material and supplier specifications and packing and shipping requirements caused the problems with the fleece jackets.  The evidence, however, is otherwise.  J-Loong had previously produced conforming samples which satisfied all GFSI requirements.  In addition, a prior manufacturer had produced conforming jackets.

J-Loong argues that GFSI cannot seek damages for problems with the fleece jackets because upon delivery, GFSI agents in Asia certified that the jackets complied with GFSI specifications.  The inspection certificates stated as follows:

> On the basis of the above findings based on a randomly selected statistical sample we find the shipment referenced above acceptable.  This certificate does not relieve seller/supplier from their contractual responsibility with regards to quality/quantity of this delivery nor does it prejudice [the agent's] right to claim towards seller/supplier for compensation for any apparent and/or hidden defects not detected during our random inspection.

Trial Exhibit 403, JL 0320; see also JL 0340 (certificate in no way regarded as evidence of acceptance by GFSI under purchase contract).  The certificates do not reflect an unconditional acceptance by GFSI.  In

addition, the defects in the fleece jackets were not discoverable upon random inspection and the defects did not manifest themselves until after the jackets were transported to the United States.

### 1.   DM 828

On January 28, 2005, GFSI issued DM 828, a $10,906.65 charge back for expenses which GFSI incurred to dry clean the fleece jackets.  GFSI incurred these expenses as a direct result of J-Loong's non-conformity of tender to GFSI.  The expenses were commercially reasonable and necessary under the circumstances.  GFSI is entitled to the full amount of DM 828.

### 2.   DM 867

On January 28, 2005, GFSI issued DM 867, a $1,577.00 charge back for expenses which it incurred to transport the fleece jackets to and from the dry cleaning businesses which laundered the jackets. GFSI incurred these expenses as a direct result of J-Loong's non-conformity of tender to GFSI.  The expenses were commercially reasonable and necessary under the circumstances.  J-Loong does not dispute this debit memo and GFSI is entitled to recover the entire amount.

### 3.   DM 868

On January 28, 2005, GFSI issued DM 868, a charge back for expenses which it incurred for the landed cost of defective fleece jackets which it could not repair, use or sell.  DM 868 reflects the F.O.B. price plus transportation and related expenses, i.e. GFSI's cost to transport the jackets to the United States. GFSI reached this figure by multiplying the number of fleece jackets in inventory at the time it issued the debit memo (5,399) by the landed cost of each jacket ($9.56).  Because GFSI's current inventory of defective fleece jackets is 5,849, the charges should be revised to reflect the higher inventory level.  GFSI incurred these expenses (as revised) as a direct result of J-Loong's non-conformity of tender to GFSI.  The expenses were

commercially reasonable and necessary under the circumstances.  In addition to the FOB price for the jackets,

GFSI paid shipping and other charges on defective jackets which it could not sell.  GFSI can recover these

charges, in addition to the FOB price, as incidental damages on its breach of warranty claim.  Any award under

DM 868, however, must be reduced by $2.75 per garment, the average salvage value of the fleece jackets.

See Lindsley, 3 Kan. App.2d at 489, Syl. ¶ 4, 596 P.2d at 1252, Syl. ¶ 4 (party injured by breach of contract

has duty to exercise reasonable care to mitigate damages).  Under DM 868, GFSI is awarded $39,831.69,

i.e. 5849 jackets times $6.81 per jacket ($9.56 landed cost minus $2.75 salvage value).

J-Loong's failure to comply with the standards relating to fleece jackets in the Requirements Manual

constituted a breach of J-Loong's obligations and warranties under the purchase orders.  The Court awards

the following incidental damages to GFSI: $10,906.95 under DM 828, $1,577.00 under DM 867 and

$39,831.69 under DM 868.  See K.S.A. §§ 84-2-714, 84-2-715(1).

C.      GFSI Carton Labeling Requirements

The Requirements Manual provides specific instructions regarding labeling requirements for cartons

delivered to GFSI.  It establishes a charge back policy related to carton labels, and provides a $200 charge

per non-compliant purchase order plus $1.50 per carton.  The Requirements Manual also allows GFSI to

change the applicable charges at any time.  The Requirements Manual states as follows:

> GFSI, Inc. has made a commitment to implementing technology that will improve inventory
> accuracy.  The Bar Code Inventory Case Label is an intricate part of this program.  If a
> supplier fails to print and attach this carton label in accordance with these requirements,
> GFSI, Inc. will charge the supplier according to the Vendor Charge Back Matrix active at
> the date of shipment.

GFSI found two types of carton labeling problems: (1) cartons with labels which did not precisely comply with

the Requirements Manual because they contained missing or incorrect information (DM 827 and DM 849) and

(2) cartons with no labels (DM 829 and DM 831).

### 1.    Cartons With Incorrect Labels (DM 827 and DM 849)

DM 827 is a $1,463 charge back for J-Loong's failure to comply with GFSI carton labeling requirements with regard to one purchase order and 842 cartons which had some missing or incorrect information.  J-Loong does not dispute this debit memo and under the Requirements Manual, GFSI is entitled to recover the entire amount.

DM 849 is a $644.50 charge back for J-Loong's failure to comply with GFSI carton labeling requirements with regard to two purchase orders and 163 cartons with missing or incorrect information. Because J-Loong had previously committed the same offense, GFSI argues that it is entitled to double the charge from $644.50 to $1,289.00.  The GFSI charge back policy does not authorize a doubling of the charge back amount.  GFSI notes that the Requirements Manual provides that its charge back program is "subject to change at any time."  Even so, GFSI has not shown that it notified J-Loong of the proposed change to double the charge back amount for violations of the same type.  Accordingly, GFSI is not entitled to double the charge on DM 849.  J-Loong's failure to comply with the carton labeling requirements in the Requirements Manual constituted a breach of its obligations and warranties under the agreements.  GFSI is entitled to recover $644.50 on DM 849.

### 2.    Cartons With No Labels (DM 829 and DM 831)

DM 829 is a $907.00 charge back for J-Loong's failure to comply with GFSI carton labeling requirements when it did not include a label on 169 cartons on a single purchase order.  Because GFSI did not show that it notified J-Loong of a change in the charge back policy, GFSI is not entitled to double the charge on DM 829.  J-Loong does not dispute that GFSI is entitled to $453.50 under DM 829, and under the

-14-

Requirements Manual, GFSI is entitled to recover $453.50 on DM 829.

DM 831 is a $2,812 charge back for J-Loong's failure to label 804 cartons in a single purchase order. J-Loong argues that GFSI agents in Asia easily could have discovered that these cartons were unlabelled,[11] and GFSI offers no explanation for its agents' failure to discover this defect. Robert Tejada of GFSI conceded that if GFSI agents had performed an inspection after the labels were supposed to be applied to the cartons, they should have noticed this defect at the factory. Accordingly, under common law principles of agency law, GFSI is estopped to argue that the lack of carton labels did not comply with the Requirements Manual. See Pingree v. Triple T Foods, Inc., 430 F. Supp.2d 1226, 1238-39 (D. Kan. 2006) (apparent agent); Miotk v. Rudy, 4 Kan. App.2d 296, 300, 605 P.2d 587, 591 (1980) (principal liable for all acts of agent within apparent scope of authority conferred on it); see also K.S.A. § 84-1-103 (Kansas UCC expressly preserves, among other areas, general common law principles of the law of principal-agent). Accordingly, GFSI is not entitled to recover under DM 831.

## IV.     Undelivered Garments

GFSI placed several purchase orders after it experienced problems with the polo shirts and fleece jackets. J-Loong did not specifically refuse the purchase orders and consistent with the parties' practice, its failure to do so constituted acceptance of GFSI's offer to purchase. Furthermore, GFSI reasonably relied on J-Loong to supply the goods subject to the purchase orders. By December 16, 2004, however, GFSI had withheld payment on certain purchase orders to recoup various charge backs. On December 16, 2004,

---

[11]     Even though the same argument seems to apply to DM 829, J-Loong does not dispute the charge back of $453.50 on DM 829. Given that DM 831 involves significantly more cartons, the Court considers J-Loong's argument only as to DM 831.

J-Loong advised GFSI that it would suspend production on all pending purchase orders until it reached agreement with GFSI on the charge backs.

Each purchase order was a separate and distinct contract, and J-Loong breached its agreement to supply goods under the purchase orders which it had accepted. To maintain adequate inventory, GFSI was forced to purchase goods to replace garments which J-Loong should have provided. GFSI procured the replacement goods at the cost specified in the purchase orders to J-Loong, but it had to air freight the replacement goods to the United States to replenish its inventory.

J-Loong maintains that it was entitled to suspend performance of the remaining contracts pending receipt of adequate assurances that GFSI would pay. K.S.A. § 84-2-609 provides as follows:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

> (3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

> (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

To suspend performance, a seller must (1) have reasonable grounds for insecurity regarding the buyer's performance under the contract; (2) demand in writing adequate assurance of the buyer's future performance and (3) not receive such assurance from the buyer. See Smyers v. Quartz Works Corp., 880 F. Supp. 1425, 1432-33 (D. Kan. 1995); LNS Inv. Co. v. Phillips 66 Co., 731 F. Supp. 1484, 1487 (D. Kan. 1990). J-

Loong has not satisfied the requirements for suspension of performance: it did not submit a written demand for

assurance of future performance by GFSI.  J-Loong simply notified GFSI that it would suspend production on

all orders until it could reach a compromise to settle the charge backs on past invoices.  Because J-Loong did

not comply with the statutory requirement for suspension of performance, GFSI is entitled to recover cover

damages for non-delivery of garments.[12]

On January 28, 2005, GFSI issued DM 870, an estimate of its cost to transport replacement goods.

At trial, GFSI sought to recover its expenses to air freight the garments ($73,215.53).  The ordinary cost for

freight by ocean carrier for the same garments is $6,913.06.  Accordingly, GFSI is entitled to recover

$66,302.47, i.e. the increased cost to have the replacement garments sent by air freight.  GFSI reasonably

incurred the costs associated with DM 870, as revised, in effecting cover within the meaning of K.S.A.

_____

[12]        J-Loong argues that (1) in the pretrial order, GFSI did not claim that its suspension of
performance was legally unjustified and (2) some of the air freight charges in DM 870 relate to styles other than
the fleece jacket and polo styles at issue in this case.  The Court agrees that GFSI could have more artfully
worded its claim.  Even so, J-Loong has been on notice that GFSI was seeking air freight charges for the entire
amount under DM 870.  In the pretrial order, GFSI sought $381,545.39 on a series of debit memos issued
to J-Loong.  See Pretrial Order (Doc. #52) at 4.  GFSI identified those debit memos in an attachment to its
state court petition and described DM 870 as air freight "required to bring in substitute garments due to
cancelled orders."  Exhibit A to Petition For Money Damages Pursuant To Section 2-711 Of The Uniform
Commercial Code, K.S.A. 84-2-711 et seq., attached as Exhibit 1 to Defendant's Notice Of Removal And
Designation Of Place Of Trial (Doc. #1) filed July 15, 2005.  Because J-Loong has not identified any surprise
or prejudice by virtue of the fact that GFSI seeks recovery of the entire amount under DM 870 and GFSI has
consistently sought to recover the full amount under DM 870 since it filed this action, the Court liberally
construes the pretrial order to include a claim for non-delivery of garments other than the two styles of fleece
jackets and polo shirts at issue in the other debit memos.  See Theno v. Tonganoxie Unified Sch. Dist. No. 464,
394 F. Supp.2d 1299, 1303 (D. Kan. 2005) (pretrial order liberally construed to cover all legal or factual
theories embraced by language or inherent in issues defined therein); Van Enters., Inc. v. Avemco Ins. Co., 231
F. Supp.2d 1071, 1081 (D. Kan. 2002) (pretrial order liberally construed to cover any legal or factual theories
that might be embraced by its language) (citing Koch v. Koch Indus., Inc., 179 F.R.D. 591, 596 (D. Kan.
1998)).

§§ 84-2-712 and 84-2-715(1).

## V.      Prejudgment Interest

In this diversity case, prejudgment interest is a substantive matter governed by state law, so Kansas law controls.  Aerotech Res., Inc. v. Dodson Aviation, Inc., 91 Fed. Appx. 37, 47 (10th Cir. 2004).  Under Kansas law, "[c]reditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; . . . for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts." K.S.A. § 16-201.  An unliquidated claim does not draw interest until it becomes liquidated, usually by judgment.  Kearney v. Kan. Pub. Serv. Co., 233 Kan. 492, 505, 665 P.2d 757, 769 (1983).  A claim becomes liquidated when the amount due and the date due are fixed and certain or when both become definitely ascertainable by mathematical computation.  See Plains Res., Inc. v. Gable, 235 Kan. 580, 583, 682 P.2d 653, 657 (1984).  An award of prejudgment interest lies within the district court's discretion.  Aerotech, 91 Fed. Appx. at 47.  Considerations of fairness and traditional equitable principles are to guide the exercise of this discretion.  Wichita Fed. Sav. & Loan Ass'n v. Black, 245 Kan. 523, 544, 781 P.2d 707,  721 (1989).

GFSI advised J-Loong of some costs which it had incurred or was incurring to address defects with the polos and fleece jackets, but it did not provide J-Loong the debit memos until February of 2005.  Because GFSI did not demand or advise J-Loong of a specific amount before that time, the Court declines to award prejudgment interest before February 28, 2005.  See Frank v. Bloom, 634 F.2d 1245, 1259 (10th Cir. 1980) (affirming denial of prejudgment interest because prevailing party partially responsible for delay in receiving award).  Until GFSI demanded a specific amount as incidental damages on each purchase order, the claims were essentially unliquidated.  As of February 28, 2005, however, nearly all of the GFSI claims were

-18-

liquidated.  The Court in its discretion awards GFSI prejudgment interest from February 28, 2005 for those invoices which were due before that date.  See La Villa Fair, 219 Kan. at 406, 548 P.2d at 835 (consequential damages from manufacturer's breach of contract included handling, transportation and storage expenses directly resulting from breach, and award subject to pre-judgment interest under K.S.A. § 84-2-715); Schatz, 7 Kan. App.2d at 683, 647 P.2d at 827 (buyer awarded pre-judgment interest on consequential damages under K.S.A. § 84-2-714); Hemmert Agric. Aviation, Inc. v. Mid-Continent Aircraft Corp., 663 F. Supp. 1546, 1554 (D. Kan. 1987) (buyer awarded pre-judgment interest on incidental and consequential damages where buyer revoked acceptance).  On invoices which were due after February 28, 2005, the Court awards prejudgment interest from the date on which the invoices were due.  Because the purchase orders, invoices and GFSI requirements manual do not reveal an intent to apply a particular rate of interest, the Court applies the ten per cent annual rate under Kansas statute.  See K.S.A. § 16-201.

As detailed above, the Court awards $319,197.01 to GFSI under the various debit memos.[13]  As of February 28, 2005, GFSI had incurred $293,480.26 in expenses.  GFSI is entitled to $63,198.76 in prejudgment interest on that amount (ten per cent interest for 786 days from February 28, 2005 through April 20, 2007).  GFSI also incurred $25,716.75 in expenses in April and May of 2005 and is entitled to $5,092.89 in prejudgment interest on that amount as detailed below:

---

[13]  DM 769: $104,221.22; DM 827: $1,463.00; DM 828: $10,906.65; DM 829: $453.50; DM 831: $0; DM 847: $38,836.14; DM 849: $644.50; DM 863: $2,270.70; DM 864: $375.84; DM 865: $8,226.06; DM 867: $1,577.00; DM 868: $39,831.69; DM 869: $44,088.24; DM 870: $66,302.47.

| Invoice | Due Date | Amount | # Days Interest | Interest Due As of 4-25-07 |
|---|---|---|---|---|
| MCI H 549748 | 04-07-05 | $7,277.91 | 748 | $1,491.47 |
| MCI H 558831 | 04-15-05 | $353.40 | 740 | $71.65 |
| MCI H 580268 | 05-08-05 | $4,255.43 | 717 | $835.93 |
| MCI H 587853 | 05-14-05 | $13,705.43 | 711 | $2,669.74 |
| MCI H 590201 | 05-19-05 | $124.58 | 706 | $24.10 |
| **TOTAL** | | | | $5,092.89 |

**IT IS THEREFORE ORDERED** that GFSI, Inc. take $319,197.01 on its claims against J-Loong Trading, Ltd. in addition to pre-judgment interest in the amount of $68,291.65.

**IT IS FURTHER ORDERED** that J-Loong Trading, Ltd. take $426,777.30 on its claims against GFSI, Inc. in addition to pre-judgment interest in the amount of $102,358.14.

Dated this 25th day of April, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-20-